1                    UNITED STATES DISTRICT COURT
                        DISTRICT OF KANSAS
2

3
UNITED STATES OF AMERICA,              )
4                                      )
   Plaintiff,                          )   Case No. 16-20016-07
5                                      )
   v.                                  )
6                                      )   Kansas City, Kansas
ANGEL LANDA-AREVALO,                   )   Date:  8/18/2021
7                                      )
   Defendant.                          )
8  ....................................)

9

10                TRANSCRIPT OF COMPETENCY HEARING

11            BEFORE THE HONORABLE DANIEL D. CRABTREE
                UNITED STATES DISTRICT COURT JUDGE
12

13  APPEARANCES:

14  For the            Tristram W. Hunt
    Plaintiff:         United States Attorney's Office
15                     500 State Avenue
                       Suite 360
16                     Kansas City, KS 66101

17
    For the            J. Justin Johnston
18  Defendant:         Johnston Law Firm, LLC
                       811 Grand Boulevard, #101
19                     Kansasa City, MO 64106

20
    Interpreter:       Rosario Garriga
21

22

23

24  _____
         Proceedings recorded by machine shorthand, transcript
25  produced by computer-aided transcription.

1                              I N D E X

2

   <u>Plaintiff's Witnesses</u>:                              <u>Page</u>

3

   ALICIA GILBERT, Ph.D.

4     Direct Examination By Mr. Hunt                          8
      Cross-Examination By Mr. Johnston                       18

5     Redirect Examination By Mr. Hunt                        36

6

7

                              E X H I B I T S

8

   Plaintiff's

9  <u>Exhibits</u>              <u>Offered</u>              <u>Received</u>

10      1                      17                      17

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

3

1         (Court called to order at 1:30 p.m.)

2         THE COURT:  This is Case No. 16-20016, specifically as

3    it applies to Defendant No. 7 in the matter.  I'll hear from

4    the parties with their appearances, beginning with the United

5    States.

6         MR. HUNT:  May it please the court, Tris Hunt

7    appearing on behalf of the United States.

8         THE COURT:  Mr. Hunt, good afternoon.

9         For Mr. Landa-Arevalo.

10        MR. JOHNSTON:  Justin Johnston on behalf of

11   Mr. Landa-Arevalo who also appears in person and in custody,

12   Your Honor.

13        THE COURT:  Mr. Johnston and Mr. Landa-Arevalo, good

14   afternoon.

15        THE DEFENDANT:  Good afternoon, Your Honor, I still

16   decline any --

17        THE COURT:  I'm not able to hear you, sir.

18        THE DEFENDANT:  Thank you, Your Honor.

19        THE COURT:  I don't know if you were addressing me,

20   but I didn't hear anything you said.

21        THE DEFENDANT:  Oh, I said I just reject any

22   representation from Mr. Justin Johnston.

23        THE COURT:  Your microphone's not on and I'm not able

24   to understand you.

25        THE DEFENDANT:  I decline any representation from

1    Mr. Justin Johnston; that's what I said, Your Honor.  Thank

2    you.

3           THE COURT:  Okay.  So the court would ask the deputy

4    clerk, please, to administer the oath to the interpreter.

5      (Interpreter sworn.)

6           THE COURT:  Thank you very much.

7           So, Mr. Landa-Arevalo, as we have done in each of

8    these hearings, there is an interpreter present for the hearing

9    and she is now sworn and able and willing to translate the

10   proceedings for you.

11          Mr. Johnston, do you know, Mr. Landa-Arevalo's wishes

12   on this front?

13          THE DEFENDANT:  Mr. --

14          THE COURT:  Hold on just a second.  Hold on just a

15   second.  I'm addressing Mr. Johnston.

16          THE DEFENDANT:  Thank you.  Thank you, Your Honor.

17          MR. JOHNSTON:  I do not, Your Honor.

18          THE COURT:  All right.  And I take it he's not

19   communicated any information about his position on the

20   translation or not?

21          MR. JOHNSTON:  He has not, judge.

22          THE COURT:  Do you mind if I inquire directly of him

23   about it?

24          MR. JOHNSTON:  I do not.

25          THE COURT:  All right.  Thank you.

1          Mr. Landa-Arevalo, you know where we stand.  We have

2     an interpreter here.  She is sworn.  She is able.  She is

3     certified to translate these proceedings for you, and we have

4     the equipment at the ready for you.  Do you wish to use the

5     interpretation services?

6          THE DEFENDANT:  Yes, Your Honor, I know -- I know she

7     was before -- on my hearings before, and I really appreciate

8     it.  I do not need no interpreter.

9          And also I just want to mention, besides that, I sent

10    a motion on October 12th (sic) regarding to new appointment,

11    the new appointment of counsel.  Thank you, Your Honor.

12         THE COURT:  I believe that motion was already ruled.

13         THE DEFENDANT:  No, I sent it on October 12th.

14         THE COURT:  October 12th?

15         THE DEFENDANT:  Yes, Your Honor, October 12th.

16         THE COURT:  Of last year?

17         THE DEFENDANT:  20 -- this year, Your Honor.  We

18    cannot talk about the last year.  I'm talking about -- oh,

19    August 20 --

20         MR. JOHNSTON:  August.

21         THE DEFENDANT:  I'm sorry.  20 -- I'm sorry, Your

22    Honor.  I did send a motion on October -- still -- August 12,

23    2021.

24         THE COURT:  All right.  That motion has not reached

25    the clerk or me.  What does it ask for?

1          THE DEFENDANT:  Well, I don't know what I can say

2     about it because a -- I did send it on -- like I said, again, I

3     did send that motion on August 12th from CCA, CoreCivic.

4          MR. JOHNSTON:  Your Honor, I might be able to provide

5     some background.  As I was standing outside the doorway, I saw

6     that Document 497 was filed under this case number and it is

7     styled a Motion to Appoint New Counsel by Angel Landa-Arevalo.

8     In any event, judge, the motion says what it says, but it

9     appears to be a renewed motion to replace me as counsel.

10          THE COURT:  Well, I will take that motion under

11     advisement because I've not seen -- I've not -- I don't know

12     how the court can reach that request until -- I don't know how

13     the court can reach that motion until we resolved the

14     competency issue is my view.  And so I'm going to defer that

15     for the time being and move to the matter that is noticed

16     today, and that, Mr. Landa-Arevalo, is -- it's not actually

17     noticed on the docket but it's for the purpose, as discussed at

18     the last status conference, of resolving the competency issue.

19     And so tell me, do the -- do -- counsel, do you have a method

20     of proceeding today that you propose to -- for the court to

21     follow?

22          MR. HUNT:  Yes, judge, I do.  From the government's

23     perspective, as the court knows, we've got -- Dr. Gilbert is in

24     California and is able to testify via Zoom about this case

25     about the evaluation she performed.  I would propose calling

1  her, asking questions.  I made a copy of the report that she

2  completed with a cover letter from the warden, provided a copy

3  to defense counsel, and would move to introduce the report and

4  then proceed to ask questions, presuming there would be then

5  cross-examination followed by argument.  But we're ready to

6  proceed.

7       THE COURT:  Mr. Johnston, do you have any objection to

8  the government presenting Dr. Gilbert so that she does not have

9  to sit through our various other discussions?  Is that

10  acceptable to you?

11       MR. JOHNSTON:  It is, judge.

12       THE COURT:  All right.  All right.  With that,

13  Mr. Hunt, you may proceed with your evidence.

14       MR. HUNT:  Thank you, Your Honor.

15    (Off record regarding technology.)

16       THE COURT:  Dr. Gilbert, I don't know what you're able

17  to see from the courtroom.  I'm fearful it's limited to a

18  picture of me.

19       THE WITNESS:  That's exactly what I see.

20       THE COURT:  Okay.  My apologies for that.  I'm not

21  sure we can -- we're pushing some buttons on the theory that we

22  might give you a broader view.

23    (Off record regarding technology.)

24       THE COURT:  Mr. Johnston, please.

25       MR. JOHNSTON:  If someone can e-mail me the Zoom link,

```
 1    I have my laptop right here.  Is that a viable solution?
 2            THE COURT:  I think if too many Zoom connections --
 3            MR. JOHNSTON:  We can have it right here.
 4            THE COURT:  -- circuits all open in the courtroom, our
 5    ears hurt pretty quickly, but thank you for offering the fix.
 6            Is there any objection from either party with -- to
 7    proceeding in the current format:  that is with the witness
 8    being able to see just me but not the questioner?
 9            MR. HUNT:  Not by the government.
10            MR. JOHNSTON:  I do not have an objection, judge.
11            THE COURT:  All right.  Then I'll ask the deputy clerk
12    to, please, administer the oath to the witness.
13                       ALICIA GILBERT, Ph.D.,
14    called as a witness on behalf of the Plaintiff, having first
15    been duly sworn, testified as follows:
16            THE COURT:  Mr. Hunt, you may proceed.
17                       DIRECT EXAMINATION
18    BY MR. HUNT:
19    Q.   Please state your name for the record.
20    A.   My name is Alicia Gilbert.
21    Q.   And what is your formal education?
22    A.   I have a Ph.D. in clinical psychology with an emphasis in
23    forensic assessment.
24    Q.   And when and where were you licensed to practice medicine?
25    A.   I'm licensed to practice psychology in the state of
```

1    California.

2    Q.   And are you a certified -- certified psychiatrist?

3    A.   I am not a psychiatrist; I'm a psychologist.

4    Q.   And are you certified by any board?

5    A.   Well, I'm licensed, so that's -- that's what we do.  We

6    have a licensing board, and for psychology that's how I'm

7    allowed to practice.

8    Q.   And how long have you practiced?

9    A.   I've been licensed since 2006, and prior to that I did

10   internships and practice under a supervisor.

11   Q.   And where was your first job in practice?

12   A.   I was licensed actually at Rady Children's Hospital here in

13   San Diego, and I also had a short private practice where I

14   conducted juvenile -- or evaluations for the juvenile court

15   system and for adoption, and -- and then I eventually -- I did

16   an internship here as a pre -- predoctorate in 2002 and 2003

17   here at the MCC in San Diego.

18       I left and then came back in 2008 where I -- where I

19   worked here as a staff psychologist.  And then I was promoted

20   to the forensic psychologist position in 2009, and I have been

21   doing this particular job since then and have conducted

22   probably about 600 evaluations for the federal courts across

23   the nation.

24   Q.   And, I'm sorry, I didn't catch the number; could you,

25   please, repeat that?

1    A.   Probably around 600 since 2009 is my guess.  Quite a few.

2    That's my number one job.

3    Q.   And have you testified in any competency hearings or in any

4    other manner in your field in state or federal court?

5    A.   I have testified in federal court probably about 15 to 20

6    times is my guess since 2009.  So it ranges anywhere from zero

7    testimonies to maybe three a year.

8    Q.   And have you testified based upon examinations that have

9    been ordered by federal district courts?

10   A.   Yes.  I've only testified regarding my own evaluations and

11   my own report.

12        MR. HUNT:  Judge, I'll move to have the court

13   recognize Dr. Gilbert as an expert with the field of forensic

14   psychology.

15        THE COURT:  Unless there's objection, you may proceed.

16   BY MR. HUNT:

17   Q.   So were you called upon by court order -- specifically a

18   court order of this court December 23rd, 2020, to perform an

19   evaluation of the defendant, Mr. Landa-Arevalo?

20   A.   Yes.

21   Q.   And did you submit a report dated March 16th, 2021, based

22   upon your evaluation?

23   A.   Yes, I did.

24   Q.   And where was the evaluation performed?

25   A.   It was performed here at the MCC in San Diego, typically in

1   my office or just outside of my office for testing in our

2   Psychology Department.

3   Q.   And, as part of the evaluation, if you could just describe

4   for the parties and the court what that is compromised of,

5   specifically with respect to this defendant.

6   A.   The procedures is what you're asking?

7   Q.   Yes, ma'am.

8   A.   Okay.  Typically what we do is that we meet with the

9   defendant and provide them informed consent, give them an idea

10  of what the evaluation entails.  We let them know what the

11  procedures are, expectations, what the court wants addressed,

12  and then we conduct clinical interviews.

13       We observe them here while they're here detained at our

14  facility, either through myself or through unit staff.  We do

15  testing if necessary and clinically indicated.  And then we

16  always perform some kind of interview or assessment of

17  competency as best we can.  And that's typically how we proceed

18  with our evaluations for competency specifically.

19  Q.   And would you say you generally followed that procedure

20  with respect to Mr. Landa-Arevalo's evaluation?

21  A.   I tried to do the best we could -- I could.  He had some

22  questions and concerns about the process, so it took a while to

23  establish rapport and gain some cooperation with it.  He was

24  always very pleasant, polite, respectful, but was not afraid to

25  let me know if he had concerns about it.  So we talked about

1    it, addressed it.

2         He did -- was willing to sit down and do a paper-pencil

3    test but did not complete enough items.  He left too many blank

4    for me to -- to score.  And he also did not want to do any kind

5    of assessment of his competency specifically.

6         So even with the type of assessment that I do, which is --

7    kind of is a -- a semi-structured interview designed to kind of

8    have a open dialogue and discussion about general legal terms

9    and proceedings and whatnot, typically not too intimidating, he

10   did not want to do that.  So he decided not to talk to me at

11   all about anything legal and said he only wanted to discuss

12   that with an attorney.  So I was unable to actually conduct a

13   full competency assessment with him the way I would normally do

14   it.

15   Q.  And based upon your read of his position, that appeared to

16   be a conscious decision that he would only talk to an attorney?

17   A.  Yeah, I -- it's not an unusual statement or concern for a

18   lot of people just because they do worry about

19   self-incrimination or how the report will be used against them,

20   even though it's technically not supposed to be.  It can only

21   be used for competency hearings.  He -- it's not the first time

22   I've heard concerns about that.  Usually I'm able to kind of

23   have a discussion about it and ease some of the defendant's

24   concerns.

25        But Mr. Landa did not feel comfortable doing it and I was

1   unable to change his mind, but he -- his reasoning for it did

2   not appear to be illogical or unreasonable and it's -- and I --

3   we don't force anyone to answer questions.  So that was just --

4   we kind of left it at that.  So nothing stood out as, like I

5   said, illogical or unreasonable why he did not want to

6   participate in it.

7   Q.  And were you able to diagnose and predict or have a

8   prognosis of what any issues are manifested by the defendant or

9   mental health issues?

10  A.  Well, he -- I mean, he did not really present with any

11  significant mental illness or cognitive disabilities.  He

12  always made sense.  He was logical.  We had open dialogue about

13  all of his concerns, about -- he was able to provide

14  information about his background.  I do -- I did notice some

15  anxiety that is often typical when somebody's facing legal

16  proceedings, legal consequences.

17      He did have some unusual reactions to situations where he

18  seemed a little more -- he took notes with everything.  He was

19  a little more detail oriented and maybe a little OCD-like in

20  some of his mannerisms and the way he kind of went about his

21  day.

22      And then there was one instance where he accused me of

23  lying about something that was a fairly simple explanation.  So

24  it was a little odd about it, about whether or not I knew he

25  was from Kansas or whether he was coming from Kansas or not.

1   And so I think that we were able to work it out and discuss it

2   openly about it, but it was -- initially I thought it was a

3   little odd.

4        So there was some peculiar reactions that he had, but for

5   the most part he was -- he went about his day.  He followed the

6   rules.  He didn't show any evidence of disordered thought

7   process.  He communicated properly.  He -- he managed his

8   day-to-day living.  Made phone calls to family.  He seemed

9   connected to people, at least his family members.  So there

10  wasn't a lot of evidence to suggest any kind of serious or

11  severe mental illness.

12  Q.  And did he evidence any understanding of the legal

13  situation he was in?

14       So, for example, in your report you document communication

15  where Mr. Landa-Arevalo talks about hiring his own attorney or

16  a different attorney.  Do you recall that?

17  A.  Uh-huh.  Yeah.  Yeah.

18  Q.  What were the circumstances surrounding that?

19  A.  Well, I mean, there was a couple of issues that came up

20  where I felt like he might have -- he had some understanding,

21  and that was when he didn't want to do the -- the competency

22  assessment and was worried and only wanted to speak about his

23  legal case to his attorney; and to me that's -- that's

24  indicated that he had some understanding that he was facing

25  some -- a serious -- some serious charges or was having to deal

1   with legal consequences and was worried about

2   self-incrimination and didn't want to talk to anyone other than

3   an attorney who would keep it private.  He knew that I could

4   not keep it private and was going to be putting it in a report.

5        The other issue -- I did listen to his phone calls with the

6   help of a Spanish-speaking psychologist.  And she indicated or

7   told me that he was talking to his -- the person on the phone

8   about obtaining a different attorney that -- someone that had

9   immigration experience, which would make sense given that he

10  could potentially be facing deportation if things went badly

11  for him.  So -- and that sounded reasonable to me to -- to want

12  to do that.

13       So those are some of the -- at least the two issues that

14  stood out to me that he indicated that he knew some -- some --

15  some information about how the legal system works and what he

16  wanted.

17  Q.  Ultimately, to sum up the last page of your report, which

18  would be page 9, you conclude that based on the information

19  available Mr. Landa does not appear to be suffering from a

20  severe mental illness or cognizant deficit?

21  A.  Right.

22  Q.  Is that essentially your conclusion:  that he is able to

23  understand the proceedings and the evidence against him?

24  A.  So what I did was that there was -- obviously I had some

25  concerns, you know, where he had some mild mental health

1   issues, like OCD traits and the weird, kind of strange, odd

2   accusation of me lying or misrepresentation of events kind of

3   situation, and the fact that I couldn't fully evaluate his

4   competency the way I would normally do it, you know, those --

5   those issues came up.

6        But then there was, you know, several, I guess, more items

7   that suggested that he was competent, which were the fact that

8   he didn't display any significant or serious mental health

9   issues, was rather -- he was very high functioning, taking care

10  of himself and didn't seem to have any cognitive issues and

11  that he was able to talk to the person on the phone and talk

12  about getting a different attorney and the reasons why he

13  wanted a different attorney, and then also his reasoning for

14  not wanting to participate in the competency assessment.

15       So those -- those -- so I kind of just weighed out the

16  different -- different pieces of evidence, and it appeared that

17  his -- the evidence suggesting that he was competent outweighed

18  the evidence suggesting that he wasn't.  So -- and so I leaned

19  toward him -- the opinion of that he was most likely competent.

20  Q.  If the court determined it needed more information on the

21  -- you know, for lack of a better term, gaps based upon the

22  lack of cooperation by Mr. Landa, what is the next step?

23  What's an FMC?

24  A.  The next step would be that the court -- if the court

25  should decide that he needed more assessment, he would then be

1    sent to a federal medical center where he would have at least

2    four months, a longer period of time, where he could be

3    assessed by a larger team of experts.

4        So you would have the assigned psychologist, a

5    psychiatrist, psychiatric nurses available, and then you would

6    also have psychologists that would be helping him.  They would

7    be part of the restoration treatment.  So they have basically

8    groups, psychoeducational groups, that focus on the legal

9    issues and making sure that they understand everything that has

10   to do with the legal process, and then they have a -- a

11   certification process of competency.  So that's essentially the

12   next step.

13   Q.  So I talked to you on Monday.  You indicated to me that

14   space into an FMC for this particular evaluation, the wait list

15   was long.  Do you recall that?

16   A.  Yes, unfortunately, it's very long.  Even for severely

17   mentally ill people are waiting about six to eight months to

18   get that treatment.  So it's been -- it's been a rough year.

19   Q.  I understand.

20       MR. HUNT:  I have no further questions.  Thank you.

21       Your Honor, I move to admit Government's Exhibit 1,

22   and that is the cover letter and the forensic evaluation by

23   Dr. Gilbert in this hearing.

24       THE COURT:  Any objection to the offer of Exhibit 1?

25       MR. JOHNSTON:  No, Your Honor.

1        THE COURT:  Exhibit 1 is received.  Does that conclude

2   your examination, Mr. Hunt?

3        MR. HUNT:  It does, judge.

4        THE COURT:  Mr. Johnston, you may cross.

5        MR. JOHNSTON:  Thank you, Your Honor.

6                      CROSS-EXAMINATION

7   BY MR. JOHNSTON:

8   Q.  Good afternoon, Dr. Gilbert.

9   A.  Good afternoon.

10  Q.  Hi.  My name is Justin Johnston and I have been appointed

11  to represent Mr. Landa-Arevalo, and Mr. Landa-Arevalo is also

12  present in the courtroom today.

13       THE COURT:  And, Mr. Johnston, you -- it's a -- it's a

14  personal choice.  If it -- if you are comfortable, you're free

15  to remove your mask while -- while questioning.  But if you

16  prefer to leave it on, you do; that's fine.

17       MR. JOHNSTON:  Thank you, Your Honor.  It's a little

18  better, and I'm sure the court reporter can hear me a little

19  better.

20  BY MR. JOHNSTON:

21  Q.  Dr. Gilbert, I want to make sure that I establish a -- sort

22  of a clear understanding of the contours of your opinions; in

23  other words, what your opinions are and what they aren't.  I'm

24  going to ask you a handful of questions about that.  Okay?

25       The first is you state in the last paragraph, "Mr. Landa

1    does not appear to be suffering from a severe mental illness or

2    cognitive deficit."  Is that correct?

3    A.  Yes.

4    Q.  All right.  And you state that based on information

5    available; is that correct?

6    A.  Exactly.  Yes, that's correct.

7    Q.  So let's take that first item.  What would you typically do

8    to determine whether someone had a severe mental illness or

9    cognitive deficit?

10   A.  Well, a lot of times we use questions about their history,

11   questions about how they're feeling, self-report.

12       We also do observations to see if they're able to have

13   conversations that make sense, they don't have disordered

14   speech, they don't have disordered thought process, so it's not

15   -- doesn't appear disjointed or using -- or nonsensical.  So

16   that -- those -- those kind of observations would indicate that

17   somebody would have a mental illness or even a cognitive

18   disorder.

19       If they don't appear depressed, they don't report

20   depressed, they don't have a history of it, they appear to be

21   functioning without any kind of medication treatment, then

22   those are indicators that the person is most likely functioning

23   well without any severe or serious mental illness.

24   Q.  And that -- those conclusions would be based you said on

25   meeting with the individual and observing them; correct?

1   A.  Right, correct.  We do do testing too sometimes, but it's

2   not always necessary.

3   Q.  All right.  And so did you do any kind of -- beyond

4   observing and meeting with Mr. Landa-Arevalo, did you do any

5   kind of testing as it related to mental -- excuse me -- as it

6   related to mental illness or cognitive deficits?

7   A.  I only gave him one test and he did not complete or answer

8   all the items.  And so, no, I did not get to have any kind of

9   objective testing outside of observations and self-report.

10  Q.  What was the one test that you gave him?

11  A.  I gave him the validity indicator profile, and that one

12  usually -- I give that for a couple of reasons.  One, it's --

13  it's a nice not -- not intimidating test and it kind of gives

14  me an idea of how that person will either -- cooperate with

15  testing, because it basically gives us an idea of a response

16  style.  And so it can tell me if somebody is -- is purposefully

17  suppressing their responses or if they're having trouble with

18  concentration and everything's kind of all over the place, or

19  they're willing and able to participate in the testing where

20  they're putting forth really good effort, trying to be as

21  honest as possible.

22      So -- and it also, if they are honest and do a really good

23  job putting forth their best effort, it can kind of give us a

24  very kind of dirty estimate of their intellectual functioning.

25  So that's one of the reasons I like giving it, it kind of gives

1   me an overall picture maybe how this person might proceed with

2   it -- with the complete evaluation process.

3        And so, you know, it was hard to establish rapport with

4   Mr. Landa and get him to participate in -- in the evaluation,

5   and so I figured it was an easy way to start.  Unfortunately,

6   there was a lot of missing items.  And so -- and given his

7   questioning about a lot of the evaluation process and not

8   wanting to do a lot of the pieces of the evaluation, it made

9   sense that he probably didn't -- that he didn't -- he left a

10  lot of answers un- -- a lot of items unanswered.

11  Q.  All right.  And so forgive me, I don't mean to interrupt,

12  but the only test --

13  A.  Yes.

14  Q.  -- you gave was the validity profile testing; is that

15  correct?

16  A.  Yes, that's correct.

17  Q.  And he did not finish that test; right?

18  A.  No.

19  Q.  All right.

20  A.  No, huh-uh.

21  Q.  And the point of that test is, as you testified, to

22  determine whether a person is participating fully and fulsomely

23  in the process, is not malingering, it can pick up on at least

24  indicia of malingering; right?

25  A.  A little bit, yes, but --

1    Q.   Assuming someone finishes it, it can give you an idea of --

2    a quick and dirty rough idea of intellectual functioning;

3    right?

4    A.   Right.  Right.

5    Q.   But he did not finish that test?

6    A.   No, he did not.

7    Q.   And so you didn't give him -- you didn't give him any kind

8    of personality profile testing or IQ test, did you?

9    A.   No, I did not.

10   Q.   And you didn't give him any other kind of psychological

11   testing or attempt to; right?

12   A.   No, I -- no.

13   Q.   Okay.  And so would you ever diagnose someone with having a

14   severe mental illness based solely on interviews and not based

15   on any other kind of testing?

16   A.   Yes, it's possible because, if you have enough information,

17   you can formulate a diagnosis without testing because testing

18   is not good for everybody.

19   Q.   All right.  Okay.  So on this occasion, though, you

20   observed and met with Mr. Landa-Arevalo, according to your

21   report, on I believe four occasions; is that right?

22   A.   Yes, uh-huh.

23   Q.   And about how long on each occasion did you meet with him?

24   A.   It varied.  Sometimes it was 30 minutes, sometimes it was

25   two -- two hours or plus, maybe two-and-a-half hours.  That's

1    about the typical time that I spend with everybody, and for him

2    it was probably around that time.

3    Q.   Would you have liked to have spent more time with him in

4    order to determine whether he had a severe mental illness?

5    A.   Absolutely.  I mean, I would have loved to be able to have

6    administered the Revised Competency Assessment instrument.  I

7    would have liked to have spent more time talking to him about

8    actual -- his thoughts about his case or why he's having a hard

9    time with attorneys.  It would have been very helpful to have

10   that information.

11   Q.   And I'm going to make a guess based on what I know about

12   your discipline.  But in order to get there, you got to spend

13   some time rapport building; is that right?

14   A.   Absolutely.

15   Q.   Do you feel like you had enough time with Mr. Landa-Arevalo

16   to build rapport in this case?

17   A.   Well, I spent -- most of the time we spent together was

18   having conversations and talking about, you know, trying to

19   help him and help him figure out how to -- because that's

20   typically what I do is I -- I spend a lot of time talking to

21   the defendants about my -- my role and -- and how I'm not here

22   to hurt them or help them or -- or if there is something that's

23   going on, then I can help them.

24        So typically if there's -- if they have issues or they have

25   mental health concerns, I always let them know that this is

1   their opportunity to be able to let me know what's going on so

2   then I can help them get the help they need.  So I spent a lot

3   of time talking about that.

4       And then, when Mr. Landa had issues with or concerns, we

5   spent a lot of time talking about them, and I tried to reassure

6   him multiple times, you know, what the -- the report was used

7   for and why it was important.  And -- and I would say that I

8   spent more time talking about those kind of issues than I was

9   able to spend time talking about other -- like, competency

10  issues.

11  Q.  Okay.

12  A.  So we spent a lot of time focusing on those areas of his

13  concerns, so in that sense that is typically a process of

14  rapport building --

15  Q.  Sure.  My question --

16  A.  -- if that answers your question.

17  Q.  Sorry, Dr. Gilbert.

18      So let me break it down this way:  Is it your testimony

19  that the bulk of your time spent with Mr. Landa-Arevalo was

20  trying, but ultimately failing, to build rapport with him such

21  that he would cooperate with you?

22  A.  I don't know that I necessarily failed with -- building

23  rapport, but I definitely was -- I was mildly successful, I

24  would say.  So we -- like I said, we got along.  We talked.  We

25  openly -- when he had issues, we talked about it, and sometimes

1   he was able to turn -- to change his mind a little bit about

2   things.  But ultimately there were certain issues, areas, like,

3   assessing competency that he was very strongly against.  And

4   so -- and I'm not going to force him to talk about something he

5   doesn't want to talk about.

6   Q.   Of course not.

7        You spoke about a process that could occur later where

8   there would be a team of individuals who would spend time --

9   A.   Right.

10  Q.   -- working with Mr. Landa-Arevalo if the court were to

11  order that?

12  A.   Right.

13  Q.   Would more time typically be spent there sort of

14  hand-holding, building rapport and trying to spend a little bit

15  more quality time coaching Mr. Landa-Arevalo through the

16  process and getting him to try to take these tests?

17  A.   It's possible, because at these sites they typically have,

18  you know, the staff psychologist that are working on the

19  restoration part.  They have psychology interns that are there

20  as well.  And then on top of that you have the psychologist

21  that's assigned to the case.  And then they're working closely

22  with the psychiatrist that's there full-time which we do not

23  have.  So, yeah, they have absolutely more time to conduct

24  evaluations for sure, and that's one of the reasons why they

25  are the next step.

1   Q.   Okay.  And I want to ask this question also because I

2   didn't ask it earlier.  Did you perform any kind of

3   neurological testing or consult with a neuropsychologist as it

4   related to Mr. Landa-Arevalo?

5   A.   No, I do not.  We don't have access to that.

6   Q.   Would the next level have access to a neuropsychiatrist?

7   A.   I think so.  I -- but I can't guarantee it because I'm not

8   sure who's on staff at the various medical centers and who they

9   have access to if they need consultation.  My guess is yes, but

10  I'm not certain.

11  Q.   Okay.  And so Mr. Landa-Arevalo told you at some point that

12  he'd had a -- a traumatic head injury; is that correct?

13  A.   Yes, and that was one of my concerns.

14  Q.   Okay.  And what concerned you about the existence of a

15  traumatic -- or the possible existence of a traumatic head

16  injury?

17  A.   It did -- it has -- it could potentially have a lot of

18  issues with that.  I just didn't have -- like we've talked

19  about, I just didn't have a lot of information about it.  And

20  so it can have consequences such as not processing information

21  correctly, or like I talked about before, misinterpreting

22  events, seeing things, impulsive behavior and just not

23  understanding things as correctly or understanding things

24  correctly at all.  So but there -- so I was not able to

25  actually assess any of that, specifically any neurological

1  deficits.

2  Q.  Okay.  So -- and it's your testimony, based on the

3  observations, that you didn't see any patent evidence of low

4  functioning or otherwise?

5  A.  Right.

6  Q.  But isn't it possible, based upon the history of the

7  traumatic head injury here, that some neurological testing or

8  brain scans or things of that nature would -- in a perfect

9  world would be administered?

10 A.  Absolutely, yeah.  I mean, there's always a possibility

11 there -- even if you don't have any overt signs or symptoms of

12 something, there could potentially be something here not

13 underlying that's going on.

14 Q.  And the existence of a traumatic brain injury without

15 question could -- not necessarily does, but could impact a

16 subject's ability to cooperate with their attorney or

17 understand the proceedings; right?

18 A.  Absolutely that's -- that's why it's one of the prongs,

19 yeah.

20 Q.  All right.  You made a number of observations in your

21 report, and I know you were doing your best with limited

22 information, but you talked about ruling out obsessive

23 compulsive disorder.  What led you to discuss ruling out

24 obsessive compulsive disorder?

25 A.  Well, there's just some -- like I said before, he just --

1   he walked around with a notebook.  He always notated -- was

2   taking notes on everything that was going on, and it was minor,

3   odd details, details that most people wouldn't be paying

4   attention to or which he referred to -- at one of our meetings

5   referred to notes he had taken about me saying something about

6   him being from -- not knowing he was from Kansas or something

7   which I did not recall.  So we had to spend time talking about

8   that.

9        He eventually understood the circumstances and -- and we

10  were able to work it out, but to me that was unusual.  And for

11  him to focus on whether or not I knew he was from Kansas or

12  not, that was kind of a detail that seemed small and not, like

13  -- not necessarily a big deal, but he was insistent on it and

14  kind of perseverated on it for a period of time.  So enough

15  where we had to take time out of the evaluation and take time

16  on it before we moved on.  So those instances are kind of

17  snippets of where I was kind of wondering what was going on

18  there and raised some concern.

19  Q.  All right.  And so you -- you -- it's not funny, but it's

20  notable that you used the word perseverate.

21  A.  Yeah.

22  Q.  I -- that was a note that I took.  I don't know if the word

23  appears in your report.  But as I was preparing for this

24  examination, I wrote perseverate.  What is perseveration?

25  A.  It just means they're stuck on something and can't get off

1  of it, and it is one of those symptoms that psychologists kind

2  of tend to look at a little bit.  I mean, sometimes we

3  perseverate over things because we have anxiety and it's -- and

4  it's something that we just can't let go and it's not severe,

5  it doesn't impact our whole world overall, like, life.  And

6  then for others it takes -- it's part of every day and it's

7  hard to let go and it causes significant problems in their

8  day-to-day.  So it just -- it varies.  Like a lot of things,

9  psychology is on the spectrum, so, you know, it can be mild to

10  moderate to severe.

11  Q.  Right.

12  A.  But it's one of those things or items or issues that we

13  tend to look at --

14  Q.  Right.

15  A.  -- and kind of wonder.  So that's why it was listed in the

16  report.

17  Q.  And, Dr. Gilbert, your -- some of these symptoms that you

18  note, the perseveration, the -- I believe you said at one point

19  that he accused you of lying and you had to work your way

20  through it and it seemed like --

21  A.  Right.

22  Q.  -- an odd accusation of lying?

23  A.  Yes, uh-huh.

24  Q.  Some of these things can be symptoms of obsessive

25  compulsive disorder but they can also be symptoms or

1   indications of something else; right?

2   A.   Yes, absolutely.

3   Q.   And so for those symptoms -- paranoid thinking,

4   suspiciousness, distrustfulness -- all of those things might

5   exist with OCD.  They might also exist with respect to a more

6   severe form of mental illness; right?

7   A.   Absolutely.

8   Q.   And so you would need more information, wouldn't you, to

9   discern whether Mr. Landa-Arevalo was merely suffering from

10  obsessive compulsive disorder or rather was suffering from

11  something more serious; right?

12  A.   True.   Accurate.   Uh-huh.

13  Q.   And you would have liked more time with him to assess that;

14  correct?

15  A.   That a -- in a perfect world, yes, absolutely.

16  Q.   All right.   Very quickly let me turn then to another

17  portion of your final paragraph which states -- forgive me.

18  You were unable to fully assess -- you were unable to fully

19  assess his competency with the RCAI.   Did I read that

20  correctly?

21  A.   Yes.

22  Q.   All right.   And what is the RCAI?

23  A.   It is a semi-structured interview designed to assess

24  competency-related items and knowledge, and so I tend -- we

25  tend to use it here because it's gives us a chance to have open

 1   dialogue about it.  And it's about, I think, eight pages of --

 2   oh, there's probably 40 -- there's a lot of questions, and it

 3   pertains to all the different issues:

 4       So what are the charges?

 5       What are outstanding about the charges?

 6       What are the potential consequences of their charges?

 7       What is their attorney --

 8       What -- what -- what's a plea bargain?

 9       What kind of rights do you lose if you sign a plea bargain?

10       What are your other options?

11       Do you know all your options?

12       What is guilty?

13       What does not guilty mean?

14       How is the relationship with their attorney?

15       What do they understand about the relationship with their

16   attorney?

17       What -- what can they do if they don't understand something

18   that's been said in court or something that's been told to

19   them?

20       Evidence, what is the -- what does the discovery say?

21           So, you know, there's a lot of --

22      What's appropriate behavior in court?

23      All of those things.

24           So it's -- it's -- I -- I really like it because it --

25   you're able to assess everything and have a -- a dialogue, and

1   it's semi-structured because it allows me to ask the question

2   and then rephrase it if I need to so that somebody can

3   understand it, whether it's a language barrier or -- or just

4   they don't understand that, they don't know what the word

5   means.  So -- you know, so we're able to kind of explore it and

6   really talk about it and also kind of bring in their case if

7   they want to so that I kind of assess realistic -- assess

8   whether or not they're realistic about their own particular

9   charges.

10  Q.  Okay.

11  A.  So that's what I normally use.  So it takes a while for us

12  to go through all those questions.

13  Q.  Right.

14      And so among the things you mentioned also in the RCAI is

15  some questions designed to discern the capacity of the

16  individual to disclose to their attorney the available

17  pertinent facts surrounding the offense?

18  A.  Right, exactly.

19  Q.  Another item is -- are questions designed to discern from

20  the defendant whether he has a capacity to realistically

21  challenge the prosecution witnesses; is that right?

22  A.  Uh-huh.  Yes.

23  Q.  That's a "yes"?  Okay.

24  A.  Yes.  Uh-huh.

25  Q.  Questions calculated to discern whether the defendant has

1   the capacity to testify relevantly; is that correct?

2   A.   Yeah.   Yes.   Uh-huh.

3   Q.   And there's an item that I didn't really understand, maybe

4   you can explain it further, but questions designed to determine

5   self-defeating versus self-motivating motivations; is that in

6   there or something different?

7   A.   No, I --

8   Q.   Okay.

9   A.   -- that's not part of it.

10  Q.   All right.   Fair enough.

11       You -- so Mr. Landa-Arevalo decided not to cooperate with

12  this.   So at the end of the day --

13  A.   Right.

14  Q.   -- you weren't able to assess any of these things; right?

15  A.   Right.

16  Q.   Okay.   So what you're basing your conclusion on in your

17  report in the final paragraph where you say, "There is evidence

18  to suggest Mr. Landa's lack of cooperation with the legal

19  system is purposeful rather than a product of mental illness or

20  a cognitive deficit," is based on what you heard during the

21  telephone calls where he references the need for an immigration

22  lawyer and what you heard in reference to his perceived need to

23  discuss these cognitive tests -- or excuse me, not cognitive

24  tests but competency tests with an attorney, that's what you're

25  basing it on?

1   A.  That and just his overall presentation, so yeah.

2   Q.  All right.  You state in the report that, "There is a

3   possibility that his perception of events or situations may be

4   askew which could explain --

5   A.  Yes.

6   Q.  -- his initial belief that I lied to him based on a

7   conversation he recalled differently than I did."

8       Did I read that correctly?

9   A.  Right.  Yes.

10  Q.  All right.  Is it possible that this skewed perception of

11  events could affect a subject's present ability to consult with

12  his lawyer with a reasonable degree of rational understanding?

13  A.  Absolutely.

14  Q.  You state, "He seems to focus too much on irrelevant or

15  unimportant details which then keeps him stuck and unable to

16  move on."

17      That was the perseverating; right?

18  A.  Uh-huh.  That's true.

19  Q.  Is it -- could this characteristic also affect a subject's

20  present ability to consult with his lawyer with a reasonable

21  degree of rational understanding?

22  A.  Yes, it could.  Uh-huh.

23  Q.  You also stated, "It seems difficult to try to sway him

24  from changing his opinion or view on situations or events."

25      Would you characterize some of his opinions or views he

1    expressed to you as irrational?

2    A.   Yeah, some of them were.  They were, yeah, just -- yeah,

3    there were some irrational.  Like, I wouldn't agree with them

4    necessarily, and but it's -- it's also not uncommon, I guess.

5    But I see that sometimes, so I guess it could be irrational or

6    it could be there could be a reason.  So it's kind of up in the

7    air, you know, honestly.

8    Q.   All right.  Is it possible also, doctor, that

9    Mr. Landa-Arevalo's lack of cooperation could be explained by

10   some underlying symptom of an undiagnosed mental illness or

11   cognitive deficit?

12   A.   Absolutely.

13   Q.   All right.  And is it also possible that his at times

14   paranoid thinking could be causing him to have issues

15   cooperating with his lawyer?

16   A.   Yes.  Uh-huh.

17   Q.   And I think we talked about this earlier, and if we already

18   plowed this ground I'm sorry.  Is it possible that his paranoid

19   thinking is a symptom of a mental illness or cognitive deficit,

20   which given more time or resources someone like you or someone

21   else with the BOP could diagnose?

22   A.   It's possible, yes.

23        MR. JOHNSTON:  All right.  Your Honor, I have no

24   further questions.

25        THE COURT:  Is there redirect for this witness?

1          MR. HUNT:  Briefly, judge.

2                    REDIRECT EXAMINATION

3     BY MR. HUNT:

4     Q.  So, Dr. Gilbert, are you aware the defendant had multiple

5     attorneys prior to Mr. Johnston?

6     A.  Yes.

7     Q.  And that he was non-cooperative with at least the last two?

8     A.  Yes.

9     Q.  And that the defendant continues to state he wants to be

10    represented by a lawyer but he won't cooperate with any of

11    them?

12    A.  Yes, I'm aware.

13    Q.  Could that be a strategy, perhaps not a good one, that is

14    being evidenced rather than a cognitive deficit or mental

15    illness?

16    A.  Yes, absolutely that's a possibility, too.

17          MR. HUNT:  Nothing else, Your Honor.

18          THE COURT:  Recross for Dr. Gilbert?

19          MR. JOHNSTON:  No, Your Honor.

20          THE COURT:  All right.  May the witness be released,

21    Mr. Hunt?

22          MR. HUNT:  Yes, Your Honor.

23          THE COURT:  Mr. Johnston?

24          MR. JOHNSTON:  Yes, Your Honor.

25          THE COURT:  All right.  Ms. Gilbert, we're going to go

1    ahead and terminate the broadcast your direction and coming

2    back to you.  Thank you for your appearance this afternoon.

3    You're free to leave us and disconnect.  Thanks.

4            THE WITNESS:  Okay.  Thank you so much.  Bye.

5            THE COURT:  Mr. Hunt, does the United States have

6    other evidence it wishes to present?

7            MR. HUNT:  No, Your Honor.

8            THE COURT:  Mr. Johnston, does Mr. Landa-Arevalo wish

9    to present any evidence this afternoon?

10           MR. JOHNSTON:  I do not, Your Honor.

11           THE COURT:  All right.  Do you want to be heard on

12   argument now or do you wish to submit post-hearing written

13   comments?  What's your pleasure?

14           MR. JOHNSTON:  So, Your Honor, from my perspective I

15   think that I can handle the legal aspects and the application

16   of what was testified to in written submissions and, of course,

17   if that's the court's pleasure that's what we'll do.

18           I do have, I guess, what I would consider some

19   otherwise privileged material that I would like to proffer to

20   the court as part of the process which would require either

21   sealing the courtroom and having the government step out or

22   submit *ex parte* written submission or declaration in support of

23   those items.  And so, again -- and the reason why I would do

24   that is because one of the many things that the court is

25   capable of considering are suggestions of counsel as they

 1  relate to the interaction between the client and the lawyer.

 2  And I do fear that I would be revealing attorney-client

 3  privilege -- well, I would obviously be revealing

 4  attorney-client privilege material in that process.

 5          THE COURT:  Mr. Hunt, does the government object to an

 6  *ex parte* submission on this competency issue?

 7          MR. HUNT:  No, judge, I don't.

 8          THE COURT:  Mr. Johnston, I don't have strong

 9  preferences.

10          MR. JOHNSTON:  Why don't I do it in writing, judge,

11  that makes it simpler for everybody.  We can get the bus headed

12  back to CoreCivic.

13          MR. HUNT:  Judge, if I could be heard.  I think, based

14  upon what I've seen, based upon reviewing this report, based

15  upon the good points that counsel have made, with respect to --

16  I think which are unavoidable potential deficiencies in the

17  evaluation, the government's not going to oppose a finding that

18  Mr. Landa-Arevalo should be evaluated further at an FMC.

19  Obviously it is within the sound discretion of the court.  The

20  standard on appeal is abuse of discretion.  I think the court

21  has some basis to go on to make that determination, but I think

22  a more fulsome determination could be made with further

23  evaluation.

24          I think that this defendant is bizarre, and whether

25  it's a legal strategy or a mental defect I think has not been

1   answered by this report despite the best efforts of

2   Dr. Gilbert.

3          So my request -- the government's request is the court

4   order the defendant to be evaluated further.  Obviously --

5          THE COURT:  In lieu of the court ruling the issue now?

6          MR. HUNT:  Yes, judge.  And obviously I think it's a

7   problem as manifested by what Dr. Gilbert had to say, in terms

8   of the wait time.  So if the court agreed with the government

9   and ordered the defendant to be evaluated further, what do you

10  do with him in between?  Because it could be, I think, up to

11  eight months before he's placed to evaluate the defendant.  I

12  don't know what the answer to that is.  Obviously I know in a

13  perfect world that's done -- could be done immediately.  What

14  are the impacts on speedy trial?  I think there's some

15  questions to be, I think, hashed out.  Maybe the court knows

16  the answer to that or Mr. Johnston.

17         So my request is for the court not to rule, for the

18  defendant to be evaluated further so that when there is a

19  ruling done the court has and the ruling is based on a solid

20  finding by the most comprehensive experts so that we can have a

21  -- a final hearing and the court can rule.

22         I just don't feel like that has been accomplished here

23  despite Dr. Gilbert's best efforts.

24         THE COURT:  Doesn't this issue of the lack of

25  cooperation, doesn't this all return to the question which I

1    think our court has not decided and I don't think our circuit

2    has reached, and that is whose burden is it anyway?  And --

3         MR. HUNT:  Yes, judge, and I think that, in terms of

4    looking at that -- and I know that this court has recently had

5    a case where the court didn't actually have to decide this

6    issue.  But my understanding is the Supreme Court has not

7    decided the matter; that there are two cases the Supreme Court

8    has applied the burden of proof to the defendant, and that is

9    *Medina versus California*, 505 U.S. 437, 447 through 448, and

10   that's 1992.  The court found, however, the California statue

11   of placing the burden of proof on the defendant --

12        (Court reporter interruption.)

13        MR. HUNT:  -- the California statute of placing the

14   burden of proof on the defendant did not offend due process.

15   Further, in *Cooper versus Oklahoma*, 517 U.S. 360, et seq. 362

16   (1996), the Supreme Court stated *in dictum*, "Congress has

17   directed the accused in a federal prosecution must prove

18   incompetence by preponderance of the evidence."  Nevertheless,

19   I would note that the Supreme Court has not firmly decided who

20   bears the burden.

21        Now, obviously, as the court indicates, the courts of

22   appeal are -- are split on this issue.  The Fourth and the

23   Tenth Circuit appeals apparently place the burden of proof on

24   the defendant, while the Third, Fifth, Seventh and Ninth

25   Circuit place the burden on the government.

 1          THE COURT:  I'm -- I've lost you.  You lost me for a

 2   minute.  I wasn't aware that our circuit had reached it, and I

 3   did not cite that in the recent order, I don't think, that you

 4   referenced.  There is a --

 5          MR. HUNT:  I don't, judge.  I would have to research

 6   that further.

 7          THE COURT:  Yeah, I think there's a district court

 8   opinion within our circuit.

 9          MR. HUNT:  Which places it on the government.

10          THE COURT:  Yeah -- well, yes.

11          MR. JOHNSTON:  Judge, for my part -- sorry.  Obviously

12   I think the burden of proof is important.

13          THE COURT:  Me too.

14          MR. JOHNSTON:  And we take the position, based on the

15   -- what we think are the well-reasoned opinions of several

16   circuits, that the burden is on the government to prove

17   competency as opposed to being the burden on the movant to

18   prove incompetency.

19          THE COURT:  It gets pretty dicey when the defendant

20   won't cooperate with the evaluator.

21          MR. JOHNSTON:  It does.  And so this is much of the

22   point that I was trying to establish with Dr. Gilbert, and

23   maybe I made it and maybe I didn't.  I've been representing

24   people for a long time and -- at this level and I've

25   encountered all kinds of mental illness.  And there are aspects

1   of the -- a person's presentation that manifest themselves when

2   you're talking about certain very difficult things in the

3   attorney-client relationship and trying to force a reckoning on

4   giving decisions that cause these things to come out.  And

5   there are also aspects of certain mental illness that cause a

6   person to be paranoid, and it can cause them to not want to

7   cooperate with virtually anything.

8          And so the key in many instances is building rapport,

9   is building trust.  I have done a poor job with

10  Mr. Landa-Arevalo.  And part of it is that I -- I just simply

11  haven't been able to get face-to-face with him as much as I do

12  in a non-pandemic setting with clients.  However, I think with

13  an intensive inpatient somebody might have some success with

14  that.

15         And, you know, I -- the reason why I'm angling toward

16  that is for my part and the part of prior counsel it just feels

17  like something is not right here and it feels like something

18  more than mere obstinance.  I could be wrong but I think I'm

19  right, and I'd like to have someone take a more intensive look

20  at it than the resources that were allotted in, frankly, the

21  statutory turnaround.  There was nothing else that could be

22  done in that regard, but I'd sure like -- I think an inpatient

23  setting might be -- might be the trick here to getting that

24  done.

25         THE COURT:  What -- what happens to his rights under

1  the Speedy Trial Act that's statutorily recognized in the

2  Constitution?  I recognize that a jury has found him guilty but

3  he hasn't ever been -- I don't think, had a judgment --

4          MR. JOHNSTON:  Right.

5          THE COURT:  -- against him that he's convicted.

6          MR. JOHNSTON:  Yeah, it's -- it's -- the Speedy Trial

7  Act --

8          THE COURT:  I say that all kind of in the "I think"

9  because I didn't participate in the trial of this case, but

10  that's my read of the record.

11          MR. JOHNSTON:  That's my read of the record as well.

12          The Speedy Trial Act, it -- and, frankly, the speedy

13  trial rights under the Constitution are important but not

14  absolute.  And where this defendant -- I think it's undisputed,

15  I don't think anybody would quarrel with the idea he has a

16  constitutional right to be competent at the time of sentencing.

17  And where there is so much at stake here -- the PSR I think

18  recommends over 200 months -- well over 200 months -- it's

19  really important that we try to get this right, judge.  And I

20  think the court can make findings that to continue to

21  suspend -- or toll, pardon me, the running of the Speedy Trial

22  Act and that -- and, frankly, also, having been convicted, I

23  don't know that there are speedy trial implications at this

24  point --

25          THE COURT:  Well, it's --

 1          MR. JOHNSTON:  -- now that I think about it.

 2          THE COURT:  I was going to say --

 3          MR. JOHNSTON:  I may have taken us down a road we

 4    didn't need to go down.

 5          THE COURT:  Well, I -- there was a reference to it.

 6    It concerns me because Mr. Landa-Arevalo sits in custody, he is

 7    not free, and yet he's gotten his trial and I'm not aware of

 8    any authority that says, well, the clock resumes running after

 9    a trial --

10          MR. JOHNSTON:  Nor am I.

11          THE COURT:  -- is completed.

12          MR. JOHNSTON:  I'm not aware of any such authority

13    either, and so -- and so there's -- I don't know that there's

14    anything to waive here at this juncture.

15          You know, the active question, obviously given that

16    prior counsel filed a motion for determination of competency

17    prior to, you know, beginning that jury trial is, you know,

18    whether that trial will stand.  But the trial has occurred at

19    this point, and I think for our current purposes there I think

20    his speedy trial rights have been vindicated.

21          THE COURT:  Well, I am -- I'm -- two things, and

22    they're separate, but if the burden -- if as some cases

23    suggests a defendant in a criminal case is presumed competent

24    and it is the defendant's burden to prove it isn't so, if

25    that's the law, Mr. Landa-Arevalo loses this motion.  He --

1    because he has not -- he has refused to participate in an

2    evaluation designed to find out whether he is competent and he

3    has not adduced any evidence of his own that he's not.  So the

4    burden issue is important.

5            MR. JOHNSTON:  It is without a doubt important, judge.

6    I don't -- I don't agree with the court, and I can brief this

7    further, that he's not adduced any evidence of incompetency.  I

8    think there is a lot of record evidence upon which this court

9    can hang its hat and particularly -- and I can parse through

10   the final opinion of -- written opinion of Dr. Gilbert, but I

11   think there was also much said during her testimony today that

12   at the very least would support circumstantially a conclusion

13   given other evidence that we have satisfied our burden, and

14   that would include the representations of counsel and, frankly,

15   this court's own observations and perhaps some of the

16   transcript references that went on previously.  I don't think

17   we -- I think the court can consider many things in terms of

18   making this determination.  And -- and so at the very least

19   that I think there is evidence that further evaluation is

20   needed, and I can spell this out in my briefing for sure.

21           THE COURT:  Well, let's -- let me -- let me suggest a

22   way forward, because I don't think we're going to find answers

23   today.  We're only going to identify questions and the sequence

24   to take them on.  I'd like to establish a deadline for you,

25   Mr. Johnston, to submit your -- well, both parties can submit a

1    post-hearing brief.  I was inclined just to have one round of

2    that, but I know you may want to file two things:  one that is

3    filed openly in the record and are visible to the government

4    and then a motion for leave seeking to submit, on an *ex parte*

5    basis, additional materials.  I have a sub-question about that,

6    but we'll return to it.  What time length would you ask to

7    submit what I'll call those two briefs?

8              MR. JOHNSTON:  If I order an expedited transcript of

9    what was just said, how quick can that turnaround, Ms. Greiner?

10             THE COURT:  Ms. Greiner is incredibly fast.  I'll

11   guess aloud here.  Within the week?

12             COURT REPORTER:  Whatever you want.

13             THE COURT:  She makes it happen.

14             MR. JOHNSTON:  We don't need to delay this any more.

15   How about September 3rd, judge?  That's just over two weeks and

16   that will build in a little bit of time for me to order a

17   transcript.

18             THE COURT:  Mr. Hunt, is that a workable schedule for

19   you to file your post-hearing submissions?

20             MR. HUNT:  Yes, judge.

21             THE COURT:  All right.  We'll make the papers due from

22   both sides on September 3rd.  I will then go to studying them

23   and trying to decide what to do.  If -- I'm not going to

24   establish a deadline.  If either party sees something in the

25   other's visible submissions that wants to file a response, file

1    it as quickly as you can and keep it limited in pages.

2        I -- we've had a pretty fulsome discussion.  I'm not

3    sure how much more there is to say on this very difficult

4    record, but I don't anticipate this is a -- a question I'm

5    going to enter an order on September 10th.  I think it's more

6    likely to be something in September later in the month before I

7    can get an order out on it.

8        MR. HUNT:  Just so I understand you, judge, are you

9    ordering us to submit something or just giving us the

10   opportunity?

11       THE COURT:  The latter.

12       MR. HUNT:  Okay.

13       THE COURT:  It may simply say "our request is that he

14   be returned somewhere for further evaluation."  But if that's

15   -- if that's -- and I think that's where the government is now,

16   listening to your comments, but I would like some suggestion

17   mechanically how that would work, because I've never confronted

18   a situation like this.  So if you know, please share.

19       MR. HUNT:  Judge, I don't and --

20       THE COURT:  That's why I'd like to get a post-hearing

21   submission from you.

22       MR. JOHNSTON:  I'll definitely run the traps on that

23   as well, judge.

24       MR. HUNT:  And I'm interested too, judge, in trying to

25   hash this out where the Tenth Circuit is on this, because we

1    have guidance that the -- that the burden is on the defendant.

2    But obviously this court's looked at it harder than I have, but

3    that is something that I would be interested in expounding on

4    and also essentially if the court makes a determination what

5    are the mechanics.

6              THE COURT:  Yeah, I would be interested in a burden

7    discussion as well and maybe that affects your -- your view of

8    September 3rd, because that's, as you say, Mr. Johnston, a

9    profoundly important issue and it's not a simple one.  So I'm

10   happy to give you more time.  But I'd like the full benefit of

11   every bit of thoughtful comment on the burden question as I can

12   get.

13             MR. JOHNSTON:  Well, okay, that's fair.  Let's --

14   let's do this right and go September 10th.

15             THE COURT:  All right.  Mr. Hunt, that work for you as

16   well?

17             MR. HUNT:  Yes, judge.

18             THE COURT:  All right.  Make your submissions,

19   including on the burden issue, September 10th.

20             And let me just ask, this is -- this is the

21   sub-question I referenced, Mr. Johnston.  Let's say that there

22   are things in your *ex parte* submission that are persuasive to

23   the court's evaluation or deserve at least discussion in a

24   "this -- this is the court's adjudicative processing thinking."

25   How would you suggest that the court handle that in its order?

1          MR. JOHNSTON:  Judge, I'm pausing and reflecting

2   because it's the first time a court has ever done me the

3   courtesy of asking me that question in relation to submissions.

4   We've had -- I've simply had them outed in the past.  And it

5   happens and it is what it is.  But --

6          THE COURT:  You're telling me you're going to submit,

7   on an *ex parte* basis, things that are not within the privilege?

8          MR. JOHNSTON:  Right.

9          THE COURT:  I don't think you can go to

10  Mr. Landa-Arevalo for a variety of reasons and get consent to

11  waive that privilege.

12         MR. JOHNSTON:  Right.

13         THE COURT:  And so you're going to submit it --

14         MR. JOHNSTON:  To you.

15         THE COURT:  -- to me -- to the court only.  So now

16  let's say it persuades in some important way.

17         MR. JOHNSTON:  Right.

18         THE COURT:  Does the public deserve to know this

19  information was persuasive?

20         MR. JOHNSTON:  Arguably, yes, judge.  And so let me

21  grapple with that one a little bit because that's a tricky

22  issue.  And, frankly, I've already, you know, gone down the

23  road of consulting ethics counsel on this, so I might as well

24  get back on their dime.  So...

25         THE COURT:  Okay.  All right.  I'll look for those

1    submissions.  And, Mr. Hunt, I'm interested, of course, in your

2    thoughts on burden as well and also on the "if an additional

3    evaluation is ordered, how might that happen, where might that

4    happen, what might that look like."

5         MR. HUNT:  Agreed, judge.  And I think with respect to

6    the -- the attorney-client issue that the court is raising, I

7    think you can look to the 2255s where a defendant is using the

8    privilege as a sword and a shield; I think along those lines.

9         I'd also note, in closing here, in prosecuting this

10   defendant from beginning to now -- and I believe it would be in

11   the record prior to trial -- it would be my practice to state a

12   plea offer on the record.  And I believe the plea offer in this

13   case for this defendant -- and subject to being corrected by

14   the record -- was in the order of 48 months.  In the time that

15   he had already spent in jail -- and, again, this is going back,

16   correcting me by the record -- he would not have served very

17   much longer.

18        And there's two things with that:  Either there is a

19   manifestation that is illogical to most people.  However, if

20   somebody really believes they're innocent, really believes

21   they're innocent, they're not going to take any, any plea.  And

22   that's not illogical.  That's not illogical.

23        THE COURT:  Or -- or any sign of an incompetency, it

24   is instead a principled stance a person is entitled to take.

25        MR. HUNT:  Exactly.  I don't know if the court knew

1    that.  But I think it's something that I think about.  I think

2    Mr. Johnston should and the court should, too.

3            THE COURT:  I was familiar with that.  I read that

4    part of the transcript.  Obviously I wasn't assigned to the

5    case when that colloquy took place, but I was familiar with

6    that fact.

7            Let me just -- give me just a moment.

8        (Off record with deputy Clerk.)

9            THE COURT:  So let me just bring you up to date.  I

10   was surprised to hear from Mr. Landa-Arevalo that he had

11   submitted by mail a new motion having to do with the counsel

12   relationship.  I've now said everything I know about it because

13   I haven't seen it.  I looked at the docket in this case

14   yesterday.  I ran a motions report.  There were no open motions

15   pending.  Mr. Landa-Arevalo's motion arrived and was docketed

16   at 1:23 this afternoon for a hearing that began at 1:30, and I

17   confess I did not check the docket in that interim.

18           Let me hear from you.  It seems like I have had

19   hearings with Mr. Landa-Arevalo on past filings of the nature

20   that I presume this one is.  Maybe it's not.  What is your view

21   on what needs to happen with that new motion?  I'll start with

22   you, Mr. Hunt, because I'm not sure who to look to over at

23   defense table.

24           MR. HUNT:  And, judge, like the court, the first time

25   I knew about that motion was when I encountered Mr. Johnston

1    who had it on his telephone.  So I can only speculate what it

2    is.  Having seen so many others, I don't know if the court

3    thinks it needs to set it for a hearing.  If we can take

4    15 minutes for the court to review it and for to us review it

5    so it can be taken care of here today and the court not waste

6    more time on that particular issue, I think that would be fine,

7    too, if the court and Mr. Johnston had time.

8                THE COURT:  Mr. Johnston?

9                MR. JOHNSTON:  Your Honor, it's another motion to

10   disqualify me, so I think I better stand silent on that one.

11               THE COURT:  Well, I'm not -- I'm not going to do it

12   today because I want -- I want to give the motion whatever

13   consideration its content warrants.  I want to think about what

14   the cases tell me, district courts, they're supposed to do when

15   they get one of whatever this is when they receive it.  And so

16   if I conclude that there -- that the court should conduct a

17   colloquy directly with Mr. Landa-Arevalo about his filing, I'll

18   ask Ms. Garrett to notify you, negotiate the scheduling of

19   that.  And so I may see you again before I get your

20   permissions, but I do want to be as attentive to the case as I

21   can be and try to find our way to the right outcome.  So

22   I'll -- stay tuned on that.

23               I'm not going to do it today.  If it were -- if things

24   were simpler and better to find, I might take a recess.  I

25   think this case does not fit into that column, and so I'll have

1    to do it separately.

2         Anything else from your table, Mr. Hunt?

3         MR. HUNT:  No, judge.

4         THE COURT:  From you, Mr. Johnston?

5         MR. JOHNSTON:  No, Your Honor.  Thank you.

6         THE COURT:  All right.  Thank you for your

7    presentations.  We'll go ahead and stand in recess for purposes

8    of today.

9        (Proceedings adjourned.)

10

11

12                      CERTIFICATE

13        I certify that the foregoing is a true and correct

14    transcript from the stenographically reported proceedings in

15    the above-entitled matter.

16        DATE:  August 24, 2021

17

18                    /s/Kimberly R. Greiner
                     KIMBERLY R. GREINER, RMR, CRR, CRC, RDR
19                    United States Court Reporter

20

21

22

23

24

25